BIRCH, Circuit Judge,
dissenting:
For the reasons that follow, I respectfully dissent. This is the classic case that law students study to understand the adage “hard facts make bad law.” Those hard facts (the majority calls it a “sad case” and a “crime of unspeakable brutality”) have caused the trial court and a majority of this court to elevate an evidentiary rule, improperly administered, over a criminal defendant’s basic right to “present his own witnesses to establish a defense. This right is a fundamental element of due process of law.” Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d *1285 1019 (1967); Chambers v. Mississippi 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973) (“Few rights are more fundamental than that of an accused to present witnesses in his own defense.”). As demonstrated below, the exclusion of the defense’s expert “gutted” its only viable defense. See, infra, notes 6 & 10. And, while the trial court is indeed vested with broad discretion in ruling upon the relevancy and admissibility of evidence, we have appropriately, until this case, held that “[sjuch discretion does not, however, extend to the exclusion of crucial relevant evidence necessary to establish a valid defense.” United States v. Kelly, 888 F.2d 732, 743 (11th Cir.1989).
. What is particularly disturbing is that the trial court allowed the government, over objection, to use two FBI laboratory technicians, who were called as fact witnesses in the government’s case-in-chief, on rebuttal to testify as to the import'of a láck of forensic evidénee found at the crime scene without requiring any support for their testimony of a statistical or scientific nature. The lack of such forensic evidence and its import was precisely the testimony the defense expert witness was prohibited from providing. See, infra, notes 7 & 22. What was good for the government gander essentially cooked the defense’s goose in this case.
I. BACKGROUND
The trial court’s ruling in this case was an abuse of discretion for two principal reasons: (a) the district court committed a Daubert[1] error, which involved two parts: (1) ■ requiring scientific ' evidence for the defense’s experience-based expert to be reliable while (2) not similarly requiring the Government’s experience-based experts to have a scientific basis for their testimony; and (b) the district court’s Daubert error essentially deprived Frazier of the opportunity to present a meaningful defense. I address each error in turn.
A. Erroneous Daiibert Rulings •
Before trial, Frazier gave notice to the Government that he intended to offer the testimony of Robert Tressel, a forensic investigator and former police officer, as an expert under Federal Rule of Evidence 702. Rule 702 “assign[s] to the trial judge the task of ensuring that an expert’s testimony both rests on a reliable foundation and is relevant to the task at hand.” Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Accordingly, the Government made a motion in limine to exclude Tres-sel’s testimony under Daubert, and the district court accordingly held a hearing on the motion. During the Daubert hearing, it became clear that Tressel’s expertise was based on his experience,[2] which also *1286 was informed by scientific studies[3]: for ten years, Tressel worked as an investigator in Cobb County’s unit on Crimes Against Persons, a unit which investigates homicides, rapes, other sexual assaults, and armed robberies. R5 at 5-6. Tressel estimated that he worked on as many as 250 sexual assault cases during his tenure. Id. at 9. In addition, Tressel spent thirteen years as chief investigator in the Cobb County Medical Examiner’s Office, id. at 10, and currently owns and operates a private forensic investigation office. Def. Ex. 1. Based on Tressel’s back *1287 ground, the district court deemed him “a very qualified criminal investigator.” R5 at 66.
1. Requiring Scientific Evidence
Despite Tressel’s qualifications as an expert, the district court decided to tightly circumscribe the limits of Tressel’s proposed testimony on the ground that Tres-sel, as an experience-based expert, needed some scientific data or study on which to base his conclusions in order for them to be reliable[4] — even though the Government admitted during the Daubert hearing that *1288 such scientific evidence existed.[5] The dis- trict court ruled that Tressel would be *1289 allowed to testify regarding the standard procedures in investigating the site of an alleged sexual assault and to testify that no hair or fluid matching Frazier was found. Tressel could testify, for example, that “[t]he forensic evidence most commonly found during the analysis of rape investigation is the transfer of hairs.” R5 at 24, Ex. 2 at 2. Tressel was forbidden, however, from testifying to two key propositions: (1) “Based on my review of the available documents, it is my professional opinion that there is no forensic evidence to substantiate the claim of rape in this case,” and (2) “With the amount of sexual activity described in the search warrant affidavit, it would be expected that some transfer of either hairs or seminal fluid would occur in this case.” R5 at 24, Ex. 2 at 2, 3. Both the defense and the trial judge recognized that excluding this key testimony left no further use for Tressel as a witness.[6] R5 at 65-66. As a result, the defense was left to elicit the lack of forensic evidence matching Frazier from two FBI laboratory technicians — Agent Karen Lanning and Agent Anthony Onorato— who examined the evidence discovered at the crime scene after a meticulously careful collection process that no one disputed. See, e.g., R5 at 24, Ex. 2 at 2; id. at 67.
2. The Error Compounded
On rebuttal, however, the district court’s initial Daubert error was compounded when the Government was allowed to use these same FBI laboratory technicians— used by the government as fact witnesses — to testify as experts. The Government offered the FBI agents as experience-based experts who would be asked to testify to the import of the lack of forensic evidence — the same “leap” that Tressel was not allowed to make. The defense objected, arguing that the prosecution had failed to communicate its intention to call expert witnesses, violating the notice provisions of Federal Rule of Evidence 16.[7] The district court, though agreeing with the defense that the Government should *1290 have been more forthcoming with its witnesses, ultimately overruled the defense’s objection, reasoning that Rule 16 requires notice only when the prosecution calls an expert during its case in chief.[8] Unlike Tressel, the court permitted the technicians to testify as experts regarding “the import of the fact that there was nothing *1291 found.” R9-363. Not surprisingly, both agents testified that the lack of forensic evidence matching Frazier did not necessarily lead to the conclusion that no sexual contact had occurred. R9-371, 387.
B. Frazier’s only Viable Defense was Eviscerated
Allowing the FBI agents to testify as to the import of finding no forensic evidence, while not allowing Tressel to do the same, essentially eviscerated Frazier’s principal and only practical defense — questioning the credibility of the victim to show that if the rape did not occur, neither did the kidnapping.[9] The district court even admitted as much.[10] Needless to say, the Government, in its closing argument, stressed the importance of the testimony of Lanning and Onorato that the lack of *1292 forensic evidence did not mean that the rape- — and, hence, the kidnapping — did not occur. The Government also mentioned the scientific “studies” that it required of Tressel but not of its own experts.[11] The defense, on the other hand, without any experts to quote or studies on which to rely, could make only the bald argument that the lack of forensic evidence did not support the victim’s account of the events.[12]
*1293 Frazier appealed, arguing that the district court abused its discretion when it limited Tressel’s testimony under the guise of Daubert, thereby eviscerating his only viable defense.
II. DISCUSSION
In this section, I will (a) state the proper standard of review, (b) discuss the district court’s erroneous Daubert rulings, and (c) discuss the effect of this ruling on Frazier’s ability to present a meaningful defense.
A. Standard of Review
We review a district court’s exclusion of expert testimony under the federal rules of evidence for an abuse of discretion. United States v. Paul, 175 F.3d 906, 909 (11th Cir.1999). As for the district court’s interpretation of Federal Rule of Evidence 702, our review is plenary. Id. No error regarding the admission or exclusion of evidence is reversible “unless a substantial right of the party is affected.” Fed. R.Evid. 103(a).
B. The District Court’s Daubert Rulings
Rule 702 of the Federal Rules of Evidence allows “a witness qualified as an expert by knowledge, skill, experience, training, or education” to testify “in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case,” provided that the “scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue.” In Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court “assign[ed] to the trial judge the task of ensuring that an expert’s testimony both rests on a reliable foundation and is relevant to the task at hand.” Id. at 597, 113 S.Ct. at 2799.
Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.
Id. at 592, 113 S.Ct. at 2796 (footnotes omitted). Thus, for proffered expert testimony to be admissible, a court must determine that:
(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.
City of Tuscaloosa v. Harcros Chem., Inc., 158 F.3d 548, 562 (11th Cir.1998).
But while “[t]he judge’s role is to keep unreliable and irrelevant information from the jury,” it “is not intended to supplant the adversary system or the role of the jury.” Allison v. McGhan Med. Corp., 184 F.3d 1300, 1311-12 (11th Cir.1999). The admissibility standard is a liberal one, United States v. Hankey, 203 F.3d 1160, *1294 1168 (9th Cir.2000), and “[a] review of the caselaw after Daubert shows that the rejection of expert testimony is the exception rather than the rule.” Fed.R.Evid. 702 advisory committee notes, 2000 amends, (emphasis mine).
Courts have found that an abuse of discretion occurs when under Daubert the admissibility bar is too, high.... “Trial judges must exercise sound discretion as gatekeepers of expert testimony under Daubert. ... [We must not] elevate them to the role of St. Peter at the gates of heaven, performing a searching inquiry into the depth of an expert witness’s soul — separating the saved from the damned.” '
Allison, 184 F.3d at 1321 (citation omitted) (quoting McCulloch v. H.B. Fuller Co., 61 F.3d 1038, 1045 (2d Cir.1995)).
Because the district court forbade Tres-sel from testifying to two key propositions, I address each proposition in turn and then discuss how the district court’s ruling was incorrectly and inconsistently applied.
1. Tressel’s Opinion on the Import of the Lack of Forensic Evidence
The district court would not allow Tres-sel to draw any inferences that the lack of forensic evidence did not substantiate the victim’s claim of rape because it would invade the jury’s province and usurp its role in deciding the penultimate issue of whether rape actually occurred. However, “it is part of the normal role of the expert not merely to describe patterns of conduct in the abstract, but to connect actions in a specific case to those patterns — sometimes even to the point of testifying that the defendant was [or was not] involved in criminal conduct.” United States v. Boney, 977 F.2d 624, 629 (D.C.Cir.1992). “Rule 702 does not bar an expert from drawing conclusions in a specific case ... [and] does not require that any inferences from the facts in the specific case be left to the jury.” Id: Thus, experts may “take the further step of suggesting the inference which should be drawn from applying the specialized knowledge to the facts.” Fed.R.Evid. 702 advisory committee notes; 1972 Proposed Rules. This is true even if the testimony “merely assist[s] the jury in interpreting the significance of the evidence,” United States v. Brown, 7 F.3d 648, 654 (7th Cir.1993), draws on “common sense,” United States v. Glover, 265 F.3d 337, 345 (6th Cir.2001), or, while helpful, is nonetheless “obvious,” United States v. Sellers, 566 F.2d 884, 886 (4th Cir.1977). Indeed, “whether the specific expert testimony focuses upon specialized observations, the specialized translation of those observations into theory, a specialized theory itself, or the application of such a theory in a particular case, the expert’s testimony often will rest ‘upon an experience confessedly foreign in kind to [the jury’s] own.’ ” Kumho Tire Co. v. Carmichael, 526 U.S. 137, 149, 119 S.Ct. 1167, 1174, 143 L.Ed.2d 238 (1999) (citation omitted) (emphasis mine).
In Brown, for instance, the defendant had been convicted of possession with intent to distribute cocaine base. 7 F.3d at 649. On appeal, “the issue was whether [he] possessed the twenty-five rocks of crack cocaine for distribution or for personal use.” Id. at 652. The government’s expert identified certain indices that are commonly associated with drug dealers. “He also described the typical paraphernalia associated with street-level crack distributors and compared that with the paraphernalia and behavior patterns usually associated with those possessing crack only for personal use.” Id. at 650. From this information, the expert concluded that the crack cocaine seized from the defendant was not intended for personal consumption, but for distribution. Id. The defendant objected, arguing that the jury could draw its own inferences from the *1295 habits and practices testimony of the expert. Id. at 652. The Seventh Circuit affirmed the district court’s refusal to exclude the testimony on the ultimate issue, reasoning that “the average juror might be unable to determine whether the absence of certain drug paraphernalia typically associated with crack cocaine is significant.” Id. (emphasis mine); see also Erickson v. Baxter Healthcare, Inc., 131 F.Supp.2d 995, 1001 (N.D.Ill.2001) (permitting medical expert to testify that information contained in the plaintiffs medical records did not support one of her allegations).
In the same way, Tressel’s conclusion in this case — that the absence of any forensic evidence did not substantiate the claim of rape — would have helped the jury to understand the significance of the negative implication to be drawn; what the prosecution even referred to as the “import ” of the lack of evidence. R9 at 363. Its exclusion by the district court was therefore an abuse of its discretion. Tressel’s proffered testimony did not state a legal conclusion as to Frazier’s guilt or innocence, and it did not “tell the jury what result to reach.” Montgomery v. Aetna Cas. & Sur. Co., 898 F.2d 1537, 1541 (11th Cir. 1990). His analysis was clear and was supported by undisputed factual findings as to the evidence retrieved from the alleged crime scene. No mere “oath-helper,” Hanson v. Waller, 888 F.2d 806, 811 n. 2 (11th Cir.1989), Tressel’s testimony would have assisted the average juror, unqualified “to determine intelligently and to the best possible degree,” United States v. Lankford, 955 F.2d 1545, 1558 (11th Cir. 1992) (Hoffman, J., dissenting), what to make of the fact that not a single shred of physical evidence was presented to link Frazier to the alleged victim qua victim in this case. His testimony would have assured against any tendency to over- or underestimate the value of this finding; indeed, the lack of forensic evidence could neither exonerate nor condemn Frazier of the rape, but only failed to substantiate it. To exclude such helpful testimony on the inappropriate ground relied on by the district court was manifestly reversible error.
2. Tressel’s Opinion on the Evidence He Would Expect to Find in This Case
The trial court also refused Tressel’s proffered testimony that “it would be expected that some transfer or either hairs or seminal fluid would occur in this case” because it found this testimony unreliable for lack of scientific data. R5 at 24, Ex. 2 at 2. In particular, the district court faulted Tressel for not having rested his conclusion on any empirical study and disfavored his testimony because it was couched in qualitative terms rather than hard numbers or statistical data. See note 3, infra. This ruling was based on an incomplete understanding of the background required of an expert witness.
The text of Rule 702 dictates that expert status may be based on experience, and the Advisory Committee Notes dictate that experience alone “may ... provide a sufficient foundation for expert testimony.” Rule 702 cmt. at 290. Without doubt, the Supreme Court’s ruling in Daubert imposes difficult gatekeeping duties on trial courts, one of which involves an exacting assault to the foundation of any proposed expert testimony to determine whether it is plumb or stands out of true, resting on shaky and unreliable ground. To survive this juridic ordeal and meet the standard of evidentiary reliability, expert testimony must be (1) “ground[ed] in the methods and procedures of science,” (2) authenticated by “more than subjective belief or unsupported speculation,” and (3) “supported by appropriate validation — i.e., ‘good grounds,’ based on what is known.” Dau-bert, 509 U.S. at 590, 113 S.Ct. at 2795. “[Tjhe trial court must scrutinize not only *1296 the principles and methods used by the expert, but also whether those principles and methods have been properly applied to the facts of the case.” Fed.R.Evid. 702 advisory committee’s note, 2000 amends. While the court must focus “solely on principles and methodology, not on the, conclusions that they generate,” Daubert, 509 U.S. at 594, 113 S.Ct. at 2797, “conclusions and methodology are not entirely distinct from one another,” and “nothing ... requires a district court to admit opinion evidence that is connected to existing data only by the ipse dixit of the expert. A court may conclude that there is ’ simply too great an analytical gap between the data and the opinion proffered.” 'Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997).
This pre-trial by fire “applies not only to testimony based on ‘scientific’ knowledge, but also to testimony based on ‘technical’ and ‘other specialized’ knowledge.” Kumho Tire, 526 U.S. at 141, 119 S.Ct. at 1171. Thus, all expert opinion “must be the product of reliable principles and methods that are reliably applied to the facts of the case.” Fed.R.Evid. 702, advisory committee notes, 2000 amends. “The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well-reasoned, and not speculative before it can be admitted. The expert’s testimony must be grounded in an accepted body of learning or experience in the expert’s field, and the expert must explain how the conclusion is so grounded.” Id. '(emphasis mine).
This uncompromising emphasis on reliability does not mean, however, that the personal experience or knowledge of the expert alone is not fir be trusted. “To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony.” Id. (emphasis mine). Indeed, “there are many different kinds of experts, and many different kinds of expertise.” Kumho Tire, 526 U.S. at 150, 119 S.Ct. at 1175. Even after Kumho Tire, “there is no question that an expert may still properly base his testimony on ‘professional study or personal experience.’ ” Maiz v. Virani, 253 F.3d 641, 668-69 (11th Cir.2001) (holding that expert testimony on the “passport-stamping practices of Mexican immigration officials ... based largely on [the expert’s] personal experience rather than verifiable testing or studies” was admissible) (emphasis mine).
However, this type of expert testimony generates certain difficulties in evaluating its reliability: “Some types of expert testimony'will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to the particular area of expertise.” Fed.R.Evid. 702 advisory committee notes, 2000 amends. “[A]n expert’s qualifications and the reliability of his testimony do not always separate into a clear dichotomy,” United States v. Jones, 107 F.3d 1147, 1160 (6th Cir.1997), and, in fact, are often blurred in the case of experience-based expert testimony. Where “the relevant reliability concerns may focus upon personal knowledge or experience,” Kumho Tire, 526 U.S. at 150, 119 S.Ct. at 1175, “inquiries into an expert’s qualifications, the reliability of his proffered opinion and the helpfulness of that opinion” frequently overlap to a significant degree. Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir.2003).
Even so, these “are distinct concepts that courts and litigants must take care not to conflate.” Id. “The trial court’s gatekeeping function requires more than simply taking the expert’s word for it.” Fed.R.Evid. 702 advisory committee notes, 2000 amends, (citation and internal quota *1297 tion marks omitted). All experts, “whether basing testimony upon professional studies or personal experience, [must] employ[ ] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.” Kumho Tire, 526 U.S. at 152, 119 S.Ct. at 1176. Courts must be creative when applying this panoptic principle, more accommodating in theory than in practice. While the Court in Daubert developed four, non-exhaustive measures of reliability,[13] it emphasized that “[t]he inquiry envisioned by Rule 702 is ... a flexible one.” 509 U.S. at 594, 113 S.Ct. at 2797. “[T]hose factors do not all necessarily apply even in every instance in which the reliability of scientific testimony is challenged.” Kumho Tire, 526 U.S. at 151, 119 S.Ct. at 1175. Whether they do “de-pendfs] on the nature of the issue, the expert’s particular expertise, and the subject of his testimony.” Id. at 150, 119 S.Ct. at 1175 (citation and internal quotation marks omitted).[14] In short, while adapting the reliability inquiry to the nature of the testimony proffered, courts must still look long and hard at the expert’s principles and methods:
For example, when a law enforcement agent testifies regarding the use of code words in a drug transaction, the principle used by the agent is that participants in such transactions regularly use code words to conceal the nature of their activities. The method used by the agent is the application of extensive experience to analyze the meaning of the conversations. So long as the principles and methods are reliable and applied reliably to the facts of the case, this type of testimony should be admitted.
Fed.R.Evid. 702 advisory committee’s notes, 2000 amends.
Case law is replete with judicially sanctioned instances of this type of deductive reasoning. For instance, physicians and other professionals,[15] valuation *1298 experts,[16] experts on industry customs and practices,[17] and handwriting analysts[18] are often permitted to derive their conclusions in this fashion. After all, “[ejxperts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called ‘general truths derived from ... specialized experience,’ ” id. at 148, 119 S.Ct. at 1174 (citation omitted), and “no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.” Id. at 156,119 S.Ct. at 1178.
Considering the four, non-exhaustive measures of reliability developed by the Daubert Court, “[gjeneral acceptance in the community is an important factor in evaluating an expert’s methodology and courts particularly emphasize this Daubert factor when reliability focuses on experience.” Groobert v. President & Dirs. of Georgetown Coll., 219 F.Supp.2d 1, 8 (D.D.C.2002). The other Daubert factors often recede in importance.[19] “The more subjective and controversial the expert’s inquiry, the more likely the testimony should be excluded as unreliable.” Fed. R.Evid. 702 advisory committee notes, 2000 amends. By the same token, the less controversial a conclusion, the more likely it is reliable. For example, it may “be useful to ask even of a witness whose *1299 expertise is based purely on experience, say, a perfume tester able to distinguish among 140 odors at a sniff, whether his preparation is of a kind that others in the field would recognize as acceptable.” Kumho Tire, 526 U.S. at 151, 119 S.Ct. at 1176. Therefore, “that an expert’s opinion is not based on statistical studies does not render that opinion inadmissible, provided that ... the testimony is based on reasoning or methodology generally accepted within a particular profession or discipline.” [20] Katt v. City of New York, 151 F.Supp.2d 313, 356 (S.D.N.Y.2001).
This is all the more true, as in this case, where probative quantitative studies are unavailable. For instance, one court refused to admit a physician’s statistical testimony based on general experience. “To allow doctors to testify about specific statistical or medical questions and base their testimony only on general experience would be to say that doctors are qualified experts on every medical subject merely because they wear white coats.” Erickson, 131 F.Supp.2d at 999. But the same court permitted similarly based qualitative testimony:
Although mere experience in the field is not a reliable basis for ... specific statistical ... opinions ..., here [the] opinion does not concern a specific statistic, but instead concerns the common knowledge in the field at the time. Experts have knowledge of the standards that govern their fields — that is part of what qualifies them as experts.... Although it would be ideal to have a citation to some medical publication to support th[e] proposition, [an expert] may testify about the standards or common knowledge of the [relevant academic] community. ...
Id. at 1001. The Third Circuit likewise recognized that an expert’s “testimony is neither conjecture nor speculation” merely because there is no available publication to substantiate it if the testimony is “well recognized by the scientific community,” “not a novel scientific theory,” and “supported by widely accepted scientific knowledge,” and the expert “relied on general experience and readings, general medical knowledge, standard textbooks, and standard references.” Kannankeril v. Terminix Internat’l, Inc., 128 F.3d 802, 809 (3d Cir.1997). Thus, expert opinion is not inherently unreliable merely for want of empirical studies if the information is commonplace in the field and “[statistical methods are ... not invariably used in such research.” Katt, 151 F.Supp.2d at 357. Where “experience-based studies are generally accepted in the industry,” a *1300 “court cannot penalize [a litigant] for the lack of scientific or academic studies and public reports on the topic....” Groobert, 219 F.Supp.2d at 9, 11; accord Benedi v. McNeil-P.P. C., Inc., 66 F.3d 1378, 1385 (4th Cir.1995) (holding that a “defendant should not be allowed ‘to escape liability simply because ... there are, as yet, no ... studies concerning [the specific subject area]’ ”) (citation omitted).
A useful construct is to imagine these two factors — whether the principle is common knowledge in the field and whether quantitative studies are available — as positioned within a four-part box. Just as no trial court would abuse its discretion by refusing to admit expert testimony considered experimental or speculative in the field for which quantitative studies were available,[21] a trial court would most certainly abuse its discretion in many instances — like this one — by refusing to admit qualitative testimony for want of statistical support where the analytic assumptions were widely-held and relevant and probative statistical data unavailable.
The district court in this case did not question Tressel’s experience — his participation in 150 sexual assault cases and thousands of crime scene investigations— or the application of that experience to the undisputed facts of the case — the absence of any physical evidence to link Frazier to the crime of rape. The court instead forbade his testimony because it was stated qualitatively, not quantitatively, and not because he failed to cite any authority in the field for the proposition. See note 2, infra. That certain symptoms are indicative of particular illnesses, that certain customs and practices are frequently used in particular industries, legal or illegal, or that certain patterns of. handwriting are distinctive have rarely been challenged as an unreliable basis for expert testimony just because they are not explicitly validated by quantitative research; even where such quantitative data could have been collected (e.g., the Government could collect data as to how drug dealers, money Iauriderers,' etc., do business based on collective data from case studies). Courts recognize that such principles are commonly known, widely-accepted, and often taken for granted in the relevant academic community. They need not be substantiated empirically because they have risen to the rank of platitudes within their respective fields.
This is what the Supreme Court meant when it instructed trial courts to ensure that an expert relying on personal experience “employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.” Kumho Tire, 526 U.S. at 152, 119 S.Ct. at 1176. What physician, for example, would be laughed out of a medical conference for asserting without supporting statistical data that he would expect the cause of classic flu-like symptoms to be, of all things, the flu? Yet, this is precisely what the district court did in response to Mr. Tressel’s testimony based on the rather uncontroversial assumption in his field that an experienced forensic investigator would expect to find hair or semen transfer in a sexual assault of prolonged duration in cramped quarters where, as here, evidence was gathered from an uncontaminated and confined crime scene. This ruling — requiring an experience-based expert to substantiate his conclusions with scientific data or studies — was an abuse, of discretion.
*1301 3. The District Court’s Daubert Rulings were Inconsistent
The trial court’s Daubert error was compounded: it excluded Tressel’s testimony relating to the import of the lack of forensic evidence found at the crime scene — on the ground that this conclusion was not supported by scientific data — and yet allowed the Government’s witnesses to testify to this very issue — without similarly requiring scientific support for their conclusions. On rebuttal, the Government was allowed to convert two defense fact witnesses — the FBI agents — into experts. Like the defense’s proffer of Tressel’s testimony, the Government offered the FBI agents as experience-based experts who would be asked to testify as to the import of the lack of forensic evidence found at the crime scene.[22] Over the defense’s objection, the two agents, not surprisingly, testified that the lack of forensic evidence matching Frazier did not prove that he had not committed the alleged sexual assaults. R9-363, 371, 387.
“It is an abuse of discretion ‘to exclude the otherwise admissible opinion of a party’s expert on a critical issue, while allowing the opinion of his adversary’s expert on the same issue.’ ” United States v. Gaskell, 985 F.2d 1056, 1063 (11th Cir. 1993) (per curiam); accord United States v. Garber, 607 F.2d 92, 95-97 (5th Cir. 1979) (en banc). This was the district court’s particular transgression here, and it constituted an abuse of discretion.
In United States v. Gaskell, we held that it was an abuse of discretion for the district court to allow the Government to present expert testimony on the determinative issue in that case, while not similarly allowing the defense to present its expert testimony. 985 F.2d at 1062-64. Gaskell involved a father charged with murdering his infant daughter by shaking her to death. Id. at 1058. The key issue was whether this shaking was willful or accidental. Id. at 1062. The Government was allowed to proffer the testimony of its expert, who stated: “We are all taught to support the baby’s head. It’s fragile. You don’t want to shake a baby’s heads [sic].” Id. (citation omitted). The defense was forbidden, however, from proffering the testimony of its expert, who would have testified to “the general lack of public awareness of the dangers of shaking an infant.” Id. We held that the exclusion of the defense’s expert was an abuse of discretion and that this error was “compounded” by the allowing the Government to present its experts. Id. at 1063-64.
In this case, similar to Gaskell, the key issue is the import of the lack of forensic evidence found in a cramped crime scene after allegedly numerous acts of sexual activity. Like in Gaskell, the district court allowed the Government to present the testimony of its expert witness as to the import of this lack of evidence, but did not similarly allow the defense to present its expert on the issue. The district court thus abused its discretion by refusing to allow the defense’s expert testimony regarding the import of the lack of forensic evidence, and this error was compounded when the Government was allowed to present expert testimony on this same issue.
C. Effect of Daubert Error on Frazier’s Defense
While abuse of discretion is undoubtedly the measuring stick we use to evaluate the evidentiary decisions of trial courts, we cannot apply it in a vacuum. We must *1302 never forget that, in criminal cases, the life and freedom of a real individual are at stake. “[TJhere are certain immutable principles of justice, which inhere in the very idea of free government, which no member of the Union may disregard, as that no man shall be condemned in his person or property without due notice, and an opportunity of being heard in his defense.” Holden v. Hardy, 169 U.S. 366, 389-90, 18 S.Ct. 383, 387, 42 L.Ed. 780 (1898). “[B]y ‘the law of the land’ is intended ‘a law which hears before it condemns.’ ” Powell v. Alabama, 287 U.S. 45, 68, 53 S.Ct. 55, 64, 77 L.Ed. 158 (1932) (citation omitted).
A person’s right to reasonable notice of a charge against him, and an opportunity to be heard in his defense — a right to his day in court — are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel.
In re Oliver, 333 U.S. 257, 273, 68 S.Ct. 499, 507-08, 92 L.Ed. 682 (1948). “Judgment without such citation and opportunity ... can never be upheld where justice is justly administered.” Hovey v. Elliott, 167 U.S. 409, 418, 17 S.Ct. 841, 845, 42 L.Ed. 215 (1897) (citation and internal quotation marks omitted). “A defendant who has been denied an opportunity to be heard in his defense has [indeed] lost something indispensable.” Snyder v. Massachusetts, 291 U.S. 97, 116, 54 S.Ct. 330, 336, 78 L.Ed. 674 (1934).
“Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense.” California v. Trombetta, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984) (emphasis mine); accord United States v. Beard, 436 F.2d 1084,1086 (5th Cir.1971).
The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant’s version of the facts as well as the prosecution’s to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution’s witnesses ..., he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.
Washington v. Texas, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). “Few rights are more fundamental than that of an accused to present witnesses in his own defense.” Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973). True enough, a defendant has no right to put on inadmissible evidence or unreliable expert testimony. See Johnson v. Wainwright, 806 F.2d 1479, 1485 (11th Cir.1986); Phillips v. Wainwright, 624 F.2d 585, 588 (5th Cir. 1980).
Several cases in our own circuit support the proposition that a criminal defendant must be allowed to present a complete defense. In particular, we have reversed lower court rulings that have excluded defense testimony where we thought a stricter standard of review prudent.
The trial court is vested with broad discretion in ruling upon the relevancy and admissibility of evidence. Its ruling will not be disturbed on appeal in the absence of clear abuse of that discretion. Such discretion does not, however, extend to the exclusion of crucial relevant evidence necessary to establish a valid defense.
United States v. Kelly, 888 F.2d 732, 743 (11th Cir.1989) (citation and internal quo *1303 tation marks omitted) (emphasis mine). “ ‘When proffered [defense] evidence is of substantial probative value, and will not tend to prejudice or confuse, all doubt should be resolved in favor of admissibility.’ ” United States v. Terebecki, 692 F.2d 1345, 1351 (11th Cir.1987) (Hill, J., dissenting) (quoting United States v. Wasman, 641 F.2d 326, 329 (5th Cir. Unit B Apr.2, 1981)). There can be no question but that Frazier’s proffered expert testimony here was fundamental to his ease. Informing the jury in simple, declarative terms that forensic evidence did not exist to substantiate the claim of rape and that hair or fluid transfer would have been expected in this type of case, would have allowed it “to hear the whole story.” United States v. Word, 129 F.3d 1209, 1213 (11th Cir.1997).
In addition, we have also expressly relaxed otherwise strict admissibility criteria when it is the defendant who seeks to introduce evidence under Rule 404(b) of the Federal Rules of Evidence. In reversing the district court, we said:
Rule 404(b) is normally used by the government to show evidence of prior similar offenses committed by the defendant. In such cases, strict standards for admissibility protect the defendant from prejudice. But in the case before us it was the defendant who sought to introduce evidence of the informant’s scheme. His right to present a vigorous defense required the admission of the proffered testimony.
United States v. McClure, 546 F.2d 670, 673 (5th Cir.1977); see also Cohen, 888 F.2d at 776 (observing that “the standard for admission is relaxed when [FRE 404(b) ] evidence is offered by a defendant”). There is no principled reason to begrudge a criminal defendant this same remedial benefit for the admissibility of expert testimony under Daubert.
III. CONCLUSION
1 conclude that the district court abused its discretion when, under the guise of Daubert, it required Tressel,. an experience-based expert witness, to support his conclusions with scientific data or studies. The majority concedes this, but then ignores it. See Maj. Op. at 1250; note 4, supra. . This Daubert error was compounded when the Government’s experience-based expert witnesses were not similarly required to support their conclusions with any scientific or statistical information. The district court’s erroneous Dau-bert ruling, in effect, eviscerated Frazier’s principal and only practical defense. Based on the district court’s incorrect Daubert ruling, and because I am convinced that, in cases like this, the defendant’s Sixth Amendment right to a' fair trial should circumscribe an interpretation of the rules of evidence eviscerating his defense, I must respectfully dissent.

. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

. Defense counsel explained that "we are not offering Mr. Tressel for his scientific expertise. Rather, we believe that he's qualified ... based on his experience ... in crime scene investigations.” R5 at 42. Defense counsel stressed that "someone like Mr. Tres-sel” was necessary "to tie all this evidence together” for the jury. Id. Defense counsel reiterated Tressel's qualifications: “Again, we are not offering him as a scientific expert but strictly based upon his experience." Id. at 43 (emphasis mine).
During the Daubert hearing, Tressel expressed his opinion that the investigation of the crime ■ scene was "thorough" and that proper “protocol for [a] rape examination was followed.” Id. at 22 ("the proffer”). Defense- counsel then asked Tressel whether, based on all the information he reviewed about the crime, he had an "opinion as to whether-or not the description of the sexual assault provided by [the victim] ... [was] accurate?” Id. at 23-24. Tressel responded that, "based on my review of the available documents, it is my professional opinion that there is no forensic evidence to substantiate the claim of rape in this case.” Id. at 24. Asked if he had "an opinion about whether or *1286 not a rape occurred,” id. at 25, Tressel responded that he "s[aw] no forensic evidence to substantiate the claim of rape in this case,” id. Based on where the sexual assault allegedly occurred [the passenger compartment of a small car], the amount of sexual contact involved, and the evidence examined by Tres-sel, he stated that he formed his conclusion because ”[t]here should have been some transfer of either hairs, fibers or fluids between the victims in this case.” Id. at 27 (emphasis mine).
Recall that the FBI laboratory found absolutely no transfer of hair (pubic, body, or head) or fluid, despite a closed and confined collection site and meticulous collection protocol. See R9 at 343-44, 352, 356-58.

. When asked by the Government during the Daubert hearing whether his experience was informed by any academic literature, Tressel responded in the affirmative:
Government: What did you rely on, sir?
Tressel: Practical Aspects of Rape Investigation, a Multi-Disciplinary Approach.
Q: And that’s by whom?
A: Robert Hazelwood and Ann Burgess.
Q: And generally what does the book say about this particular opinion you have here?
A: That the most common thing that you find is transfer of hair and fiber evidence from victim to victim — victim to perpetrator, perpetrator to victim.
Q: The most common thing you find?
A: In a rape case....
Q: What scientific literature are you familiar with concerning the transfer of hair during a sexual assault?
A: I just told you Practical Aspects of Rape Investigation. There's also a Forensic Science Handbook by Dr. Saperstein.
Q: And what does it say?
A: It just deals with hair transfer. They don't discuss pubic, head, body, limb hair. They just talk about hair transfers.
Q: Any other scientific literature that you are familiar with or you’re relying on?
A: No, sir. There is an — one of the first things I ever received as a law enforcement officer, and I'd have to really look this up because I can’t remember it exactly.
It’s a crime scene search and physical evidence handbook by Carl Cunningham, United States Government Printing Office, 1973.
Q: What does it say in regard to this area?
A: Essentially the same thing....
Q: I want to ask you specifically what does it say about the rates of transfer of hairs?
A: I don’t think anybody has ever studied the rates of transfer that I can say. They all indicate that transfer of hair is the most common trace evidence that can be found in a sexual assault case.
Q: So when you issued your opinion, you weren't familiar with any scientific literature in regard to the rate of transfer of hairs in sexual assault cases; isn't that correct?
A: I am not, no, sir....
Q: Now in regard to your opinion that you placed in your report that seminal fluids are frequently found in sexual assault cases ... what particular scientific literature did you base that on?
A: Again, it was the Practical Aspects of Rape Investigation and from my experience in investigating rape cases.
R5 at 35-38.
The academic literature relied upon by Tressel support his contention that the following types of evidence "appear with frequency in sexual assault cases”: "hairs, fibers, blood, semen, and saliva.” Robert R. Hazelwood & Ann Wolbert Burgess, Practical Aspects of Rape Investigation: A Multidisciplinary Approach 97 (1987). In fact, ”[t]he type of physical evidence probably most frequently associated with sexual assault investigations is semen.” Id. at 111. Moreover, "especially if there was physical force, hair is frequently found as evidence.” James E. Doyle, Wisconsin Dep't of Justice, Physical Evidence Handbook 138 (5th ed.1993).

. The majority concedes:
Frazier argues, however, that the district court erroneously treated scientific background as a prerequisite to expert status, and we agree that, had the court done so, it would have erred as a matter of law, because Rule 702 expressly contemplates that experts may be qualified based on experience. However, our review of the entire record suggests that the district court excluded Tressel’s testimony not because he lacked a scientific background, but because he failed to establish that his opinions were methodologically reliable or sound.
Maj. Op. at 1264 (emphasis mine).
A review of the following quoted portions of the Daubert hearing, however, clearly demonstrates that the trial court did in fact require a scientific basis for Tressel's testimony. Perhaps the majority can point and quote directly from the record for the reader, as opposed to the "our-review-of-the-entire-record-suggests” approach to justify its unjustifiable conclusion that the trial court required scientific evidence — even in the face of its own concession.
Court: Taking Defendant's Exhibit Number 2 [Tressel's Report of Findings], and using that as the basis for my rulings, ... I have no problems with his expertise as he is obviously a very qualified criminal investigator. ...
But when it comes to the conclusions that you propose to offer him for, I believe that’s exactly what the line of cases beginning with Daubert are aimed at, and I guess as the gatekeeper, I won't open it for those paragraphs [the last two full paragraphs on page 2 and the first two paragraphs on page 3 of Tressel’s report, R5 at 24, Ex. 2] that I am talking about....
Defense Counsel: Your honor, I see it as the converse to the FBI Agent or the DEA Agent, for instance, in a drug case that says typically based on my experience in a drug case, we expect to see pagers, we expect to see baggies, we expect to see code in their talk on the telephone, we expect them to see rendezvous at the fast food restaurants. All the stuff that we typically see that is based on their experience....
Court: Now, I do have a problem and particularly if there is any scientific evidence that shows that in 99 percent of the time you find pubic hair, I would have no problem with that, but he has no study....
I have no problem with him saying that’s what they’re looking for, but I do have a problem with him saying that that’s what’s found, and if it’s not there, I don’t believe there was a rape, and I’m not going to allow that.
Defense: But he's only saying it doesn’t corroborate her claim of rape, and it seems to me that those concerns that he didn’t do a scientific study are issues for cross-examination.
And the government is distressed or objecting because he is too specific rather than talking in broad terms. Where I would have thought that the reason that he is narrowing it to his opinion to that the physical evidence does not corroborate her story is a very specific statement without him drawing the conclusion that she wasn't raped, but he's saying that it doesn’t support her story, doesn’t substantiate her story.
Court: Well, what you’re trying to do is get a witness to testify to what you should be arguing....

Defense: But how is a lay jury going to know whether or not you should be finding this stuff, some trace evidence, some fluid evidence.

Court: If you have any scientific evidence that would indicate you should, I have no problem, as I said, with his testifying that’s what they look for, but when you start trying to prove that there is no case because they didn’t find it, you have got to have something more than just his opinion. You need something showing some study.
I have no idea whether — I don't have enough to tell me how often that is, and I have no basis of knowing, and based upon what you've presented today, I would not *1288 and will not allow it. I don't think that helps the jury.
R5 at 64, ’66-69 (emphasis mine).

. The following illustrative exchange took place during the Ddubert hearing:
Government: If you look at what the witness stated, he says the forensic evidence most commonly found during the analysis of a rape investigation is the transfer of hairs from the victim to the perpetrator and from the perpetrator to the victim....
There is no evidence that's been placed before you that leads you, Your Honor, to conclude that hair will be transferred in X percentage of cases, under X circumstances or even what the variables might be that control whether hair is transferred.
All we have is there is no transfer here, and hair is the most commonly found piece of evidence during a rape investigation. No evidence that when he says it's most commonly found, no evidence that that means that it's found in 90 percent of the cases, 70 percent of'the cases, 3 percent of the cases, and seminal fluid evidence is found in only two percent of the cases. You don’t have any basis based on the foundation placed before you in this record to conclude that this assists the jury in any way... .•
There is no evidence that routinely in a rape investigation you will have hairs transferred or hairs found. None. Nothing before this court to that effect....
No scientific evidence has been placed before you to show you at what rate you can expect to see a transfer of seminal fluid after sexual contact or after specific types of sexual activity.... He is not even familiar with any scientific- literature to that effect. ...

Court: Is there any scientific literature available?

Government: It is not my duty to present it. I am not moving this, Your Honor.

Court: I realize that, but is there any available that you are aware op

Government: Yes, there is, Your Honor.

Id. at 44-46 (emphasis mine). At this juncture, as an officer of the court, the prosecutor, who was well aware of the scientific literature and its inconclusive nature, as discussed below, should have advised the court of same so that the court could have made a fully informed judgment as a gatekeeper. I find the prosecutor's failure to be forthcoming a serious ethical lapse. See note 11, infra.
While limited in scope, application, and probativeness, examples of the scientific literature available (other than the two sources relied upon by Tressel) are principally two academic articles. One article studied the rate of pubic hair transfers "following one episode of sexual intercourse by each of 15 volunteer test couples” — a small sample size in a controlled environment. Mary-Jacque Mann, Hair Transfers in Sexual Assault: a Six-Year Case Study, 35 J. Forensic Sci. 951, 953 (1990). This study admitted that "[p]ub-lished controlled hair transfer studies are a valuable source of clarifying information, but ... such studies are disappointingly few in number.” Id. at 951. This article also conceded that "controlled transfer studies and the results of casework examinations should not be given equal weight.’’ Id. at 955 (emphasis mine).
A second, more recent article measured "the frequency of pubic hair transfer between a limited number of consenting heterosexual partners” — another admittedly "limited study.” David L. Exline, M.S.F.S., et ah. Frequency of Pubic Hair Transfer During Sexual Intercourse, 43 J. Forensic Sci. 505, 507 (1998). The article made two conclusions: "[fjirst, pubic hair transfer does occur during sexual intercourse, and is significant forensic evidence when found. Second, further studies in the area of hair transfer frequencies are needed to better evaluate hair transfer evidence.” Id. at 507. While this study explained that "[i]t is well known that pubic hairs may be transferred during certain sexual offenses,” it also admitted that "ff]ew controlled studies have been reported which could allow predictions of how frequently examiners might expect to observe such transfers." Id. It also conceded that "fwjithout additional studies, it is not clear that our results with a limited number of people would be found if larger numbers of individuals were examined, even under the controlled conditions described." Id. (emphasis mine). Importantly, the article did note that "fpjrior to this study [i.e., before 1998], research concerning the transfer frequency of pubic hair was based on either forensic casework or limited human subject data" and "fujntil now, when asked in court about the frequency of pubic hair transference, experts could rely only on experience because of the lack of scientific literature." Id. (emphasis mine). But this study was also of *1289 little probative value in that it examined the rate of hair transfer of "six Caucasian couples who collected their pubic hair combings immediately following intercourse." Id. at 505.
The relevant academic literature cited by these studies also reveals significant inconsistencies in reported transfer rates between these and the few other studies that have been performed. Indeed, the rates ranged from zero to forty-five percent. See id. at 506; Mann, supra, at 953. If applied rigidly to specific cases of alleged rape, each with their dissimilar circumstances and variables, these studies may be a significant source of potential error. Overall, the paucity of, inconsistency between, and lack of appropriate controls and common situational variables in these studies demonstrate that the body of knowledge in this area is still in its infancy. By comparison, the qualitative testimony offered by Tressel would have been relatively inoffensive, unobjectionable, and hardly polemical, as evidenced by its wholesale endorsement by one of the field’s leading textbooks.

. Defense counsel advised the court that whether a sexual assault occurred is "absolutely critical to ... impeaching [the victim's] credibility on the kidnapping itself,” R5 at 54, and that, if the jury did not believe the victim, the defense would have "a very strong argument ... that all of [the victim's] testimony including the kidnapping portion of her testimony should be disregarded,” id. at 56. The court acknowledged that expert testimony would be relevant to the sexual assault issue, see id. at 56-67, and, after eviscerating Tres-sel’s proposed testimony, acknowledged that the Defense had no further use for Tressel, id. at 65-66.

. After the Government called Agent Lanning to present rebuttal evidence, the defense objected and the following exchange took place:
Defense: Your honor, I think that it's just wholly unfair for the government to attempt to use these witnesses that I’ve called as fact witnesses who were under their control — now, the rule does say in their case in chief, but here I think that what the government is doing is playing games to avoid — to sandbag the defendants. They — I repeatedly asked [the Government] both in writing and with my initial discovery motion, but also subsequently, if he intended on calling any expert witnesses. And his routine re *1290 sponse was, I know, I know my obligations under Rule 16, and I don't have access to these witnesses. , They are — you know, I can subpoena them, but, you know, for instance, I can't get their curriculum vitae, can only subpoena them as witnesses, as fact witnesses....
Court: Well, now, let me ask you a couple of questions. They didn't give you copies of these reports?
Defense: All I got was the — these—I— this is what I got, your Honor.
Court: The scientific reports.
Defense: The scientific report that lists — ■ that is very — it states what exhibits they received, what their — what their analysis showed as to item to item, and what their conclusion was. Nothing about their underlying, you know, like what their opinion was as to the likelihood that this should or shouldn’t be present, the sorts of things you would use an expert to testify to. And other than what they've elicited on the stand as to their qualifications, I don’t know what, you know, what basis they have for making these opinions. I don't know how many rape offenses they have been involved in, I just don't have any way to .challenge them. And I didn't have any information to anticipate what they would say to use with another expert that I could call because the Government has avoided Rule 16 by calling them in rebuttal....
[I]f I knew what their — what they were going to testify to regarding their experience in other rape examinations, like how frequently body fluids are exchanged or whatever, then I could have called perhaps somebody from the GBI lab or from some other lab who is similarly situated to refute that information....
Government: Your Honor, as we said at the beginning, Rule 16 requires us to give expert notice on experts we’re going to call in our case in chief. We made a decision not to call experts in our case in chief. We didn't — we provided the laboratory reports to them, we didn't provide summaries of what they might testify to on other things because we weren’t calling them as witnesses. These people have been called by the defense. The rule does not require us to provide a summary of their testimony or anything else if they are going to be in the defense case or in our rebuttal case....
Government: We proffer that we're going to be asking them about their experience and qualifications in these matters, and asking ■ them what the import of this testimony they gave in this case was. To wit, what is the import of the fact that there was nothing found? Specifically, does the fact that there is no hair transfer found necessarily mean that there is no sexual contact? Does the fact that there was no seminal fluid found necessarily mean that there was no sexual contact? And we'll talk about the variables that go into whether there is a transfer of seminal fluids. And we'll ask them questions about scientific journal articles that have been written about transfer of hairs. [Other than alluding to the two articles. in a very tangential way, the articles were never introduced or entered into evidence. See R9 at 370-71.]
I mean, this, this is to rebut the testimony that the defense has put in. They are telling the jury that this means something, and I’ve got a right to shine the light on it in rebuttal. That’s all.
Defense: How am I without any prior notice supposed to cross-examine a witness on this? And I think in all honesty, Your Honor, what the rule contemplates is that if I call an expert that I have given notice under Rule 16, then the Government can refute that expert in their — in their rebuttal. But it does not contemplate that out of the blue they are going — they are going to call an expert witness who they have control over, who they have access to in advance of this trial, and I did not convert this fact witness that they created into an expert witness.
R9 at 359-64 (emphasis mine).

. Court: It’s not contrary to the rules because it's hot your case in chief. I want to be clear, though, that there is not an inconsistency in my rulings. I said that you could not use Mr. Tressell [sic] as an expert, and I had concerns there about his qualifications in scientific areas. I think — and I don't want to think — I’m convinced that I did say at the time you could - use him for a factual witness and how often this was — the same as I allowed here, how *1291 often this occurs or how often he saw it, but that I would not allow him to express opinions that I thought were beyond his field of expertise.
Id. at 364-65 (emphasis mine).

. These inconsistent rulings were perhaps exacerbated by the trial judge’s confusion regarding the issue on which he was being asked to rule — namely, whether it was an issue regarding rape or kidnapping. The following comments illustrate the trial judge’s confusion:
Court: They are endeavoring to prove her raped, as I understand it here ...
Government: Excuse me, Your Honor, I hesitate to interrupt, but we’re trying to prove a kidnapping.
Court: I know you’re trying to prove a kidnapping, but the issue of the rape is part of it, is it not? ...
Am I not correct that you’re endeavoring to prove a rape which changes the nature of the sentence?
Government: Not necessarily. To the extent ... that we're going to put up a complaining witness who says during my kidnapping I was sexually assaulted, yes ...
Court: I may have the wrong impression about this case. .,.
I in my mind have been trying to evaluate this to the proof of the crime of rape incidental to the kidnapping, ...
But I thought there was a question of proving a rape for the purpose of the sentence being a mandatory life as opposed to a kidnapping where there would not be a mandatory life. Am I correct?
Government: No, Your Honor ... The sexual assault is not an element of the kidnapping ...
Court: No, it isn't. I agree with you. That’s where I was under the misapprehension, and I thought there was — that you had a burden — I don't know where I got this from....
Court: All right. Then I had the wrong impression, but, again, that’s part of the fallacy of — this is my first contact with the case. Unlike the Magistrate is the one who has had dealings with it, I don't even know that I have actually seen the indictment. In fact I don't think I have.
All right. The rape then is not an essential element of the crime, right?
Defense: It’s not an essential element of the crime, but it’s a central part of [the victim’s] allegation that she was kidnapped, and certainly as a defense lawyer whether or not there was a sexual assault is absolutely critical to my impeaching her credibility on the kidnapping itself. ...
Defense: And I think pretty much whether or not there actually was a kidnapping is based almost entirely on [the victim's] testimony, and that's why her description of what happened, and if this focal point of her story is not to be believed by the jury, then I have, again as Mr. Frazier’s lawyer, a very strong argument to the jury that all of her testimony including the kidnapping portion of her testimony should be disregarded, as well.
Court: All right. I am beginning to focus on the issues and the relevance now. ...
Court: I think I am getting focused because I only got your brief that was filed just today just a few minutes before I came in ...
R5 at 52-54, 56-57 (emphasis mine).

. Defense counsel advised the court that whether a sexual assault occurred is “absolutely critical to ... impeaching [the victim’s] credibility on the kidnapping itself,” id. at 54, and that, if the jury did not believe the victim, the defense would have "a very strong argument ... that all of [the victim's] testimony including the kidnapping portion of her testimony should be disregarded,” id. at 56. The court acknowledged that expert testimony *1292 would be relevant to the sexual assault issue, see id. at 56-67, and, after eviscerating Tres-sel's proposed testimony, acknowledged that the Defense had no further use for Tressel, id. at 65-66.

. In its closing argument, the Government stated:
Now, you heard a lot of testimony today and the defense has presented evidence to you trying to get you to focus on evidence of the rape examination kit and the examination clothes, and wanted to point out to you that no hair was found and no semen was found. And they want to take your attention away from what happened to [the victim] and focus on this so that you will conclude, we assume, that well, no — no hair was found and no semen was found, and we point to a couple of other problems, and based on that, you need to conclude, I think they are going to argue, that you can’t believe [the victim] about the sexual assault. And if you can't believe her about the sexual assault, you can't believe her about the kidnapping. Well, that's not true....
First of all, the fact that no hair is found doesn't mean anything. As you heard from the studies involved there are lots of cases where no hairs are found. A majority— large majority of cases where no hair is found....

The witness testified, Mr. Onorato just a few minutes ago, that in the rape kits he does, perhaps 20 or 25 percent of the time he doesn't find any.

R9 at 407-09 (emphasis mine).

. During its closing argument, the defense stated:
The whole purpose of the government's case, their whole scenario is that Mr. Frazier kidnapped [the victim] to rape her. And, if you listen to [the victim’s] story, the focal point of this whole story is the rape. If the sexual assault did not occur, then I submit that you have to — that so impacts [the victim’s] credibility that you cannot convict him of [kidnapping]....
[B]efore you can convict somebody of something as serious as kidnapping or anything, really, but certainly in this case, you have got to look at the extent to which you can corroborate what [the victim] says or does the evidence say that she is not being truthful about something? And that’s the significance — that is why the rape in this case becomes so significant because it's such a large portion of what she describes ....
[Tjhere is no hair. No, no hair, no semen, no liquid, forget the semen. Why is there — we’ve got all of this — this activity, movement back and forth in the car, and you know, look at him. He's a hairy man. We don’t have any hair falling off into the car?
And we have the FBI collecting all of this evidence. Are they going to now say, oh, well, we're really pretty shoddy at this. No. We know they have problems at the lab, but there is no indications we have any problems in this case with the collection of evidence. You saw it, you heard it, you see it, they rip the car apart and send it to the lab. No, not one speck of hair from this. And we’re not, again, I think the lack of pubic hair is pretty significant when you've got all of this activity on the front seat of the car.
Id. at 417, 419, 428-29.
The search warrant described the "activity” in the Ford Escort as follows:
[The victim] stated that ... [] Frazier, while having [the victim] at knife point, told [the victim] to take her pants and panties off, at which she did. [The victim] stated that [] Frazier put his hand in her vagina and began rubbing it. [The victim] stated that [ ] Frazier then took his clothes off and asked [the victim] if the seat reclined. [The victim] stated that she told Frazier that they did not recline back. [The victim] stated that [] Frazier had sex with her on the bottom and [] Frazier on the top. [The victim] stated that [] Frazier got up and told her to get on top, which she did. [The victim] stated that after that [ ] Frazier told her to, "suck my dick”, in which she complied. [The victim] stated that [] Frazier told her to get on her hands and knees, which she did and [] Frazier inserted his penis into her anus.
*1293 [The victim] stated that [ ] Frazier had sex with her again.
Def. Ex. 5, Attach. A.

.These are whether proffered scientific knowledge can be (and has been) tested, whether a theory or technique has been subjected to peer review or publication, whether the "known or potential rate of error” of a scientific technique is within acceptable bounds for the particular discipline, and to what extent the evidence has been accepted within the “relevant scientific community.” 509 U.S. at 593-94, 113 S.Ct. at 2796-97.
The Advisory Committee Notes to Rule 702 delineate five additional factors in determining reliability: (1) Whether the testimony ”grow[s] naturally and directly out of research [experts] have conducted independent of the litigation, or whether they have developed their opinions expressly for purposes of testifying”; (2) "Whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion”; (3) "Whether the expert has adequately accounted for obvious alternative explanations”; (4) “Whether the expert is being as careful as he would be in his regular professional work outside his paid litigation consulting”; and (5) "Whether the field of expertise claimed by the expert is known to reach reliable results for the type of opinion the expert would give.” Fed R. Evid. 702 advisory committee's notes, 2000 amends, (citations and internal quotation marks omitted).

. For example, "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.” Fed.R.Evid. 702 advisory committee’s notes, 2000 amends.

. See, e.g., McGuire v. Davis, 437 F.2d 570, 572 (5th Cir.1971) (recognizing "the well-settled proposition that a physician who has examined an injured party may describe what he has seen and give his expert inferences therefrom”); Smith v. BMW N. Am., Inc., 308 F.3d 913, 919 (8th Cir.2002) (concluding that a physician's testimony as to the cause of the plaintiff’s injuries is admissible where "[h]e applied his medical knowledge and his experience to the physical evidence and came to a conclusion as to the cause of Smith's neck injury”); Heller v. Shaw Indus., Inc., 167 F.3d 146, 154 (3d Cir.1999) (concluding that a *1298 physician is not required "to rely on definitive published studies before concluding that exposure to a particular object or chemical was the most likely cause of a plaintiff's illness”); United. States v. Pollard, 128 F.Supp.2d 1104, 1123 (E.D.Tenn.2001) (finding that a physician’s testimony as to the age of young girls in a pornographic videotape is admissible where it is based only "upon multiple personal viewings of the video and the correlation of his observations to a lengthy clinical experience in assessing chronologic age based on physical and sexual development” because he was "properly qualified and possess[ed] valid scientific and/or technical knowledge”); Proto-Comm Corp. v. Novell Advanced Servs., Inc., 171 F.Supp.2d 473, 479-80 (E.D.Penn.2001) (finding the conclusions of a forensic accountant reliable because he "based his opinions on personal knowledge and experience, as well as a seemingly copious review of a multitude of relevant business documents”).

. See, e.g., United States v. Conn, 297 F.3d 548, 556-57 (7th Cir.2002) (recognizing that, just as experienced law enforcement agents may apply "knowledge gained through years of experience” to the facts in a particular case, a gun expert may "appraise, on the basis of his past experience and training, the value of ... firearms found in [a criminal defendant's] residence”).

. See, e.g., Maiz, 253 F.3d at 668-69 (holding that expert testimony based on personal experience was admissible to establish "the passport-stamping practices of Mexican immigration officials” even in the absence of any "verifiable testing or studies”); Marx & Co., Inc. v. Diner’s Club, Inc., 550 F.2d 505, 509 (2d Cir.1977) ("Testimony concerning the ordinary practices of those engaged in the securities business is admissible under the same theory as testimony concerning the ordinary practices of physicians or concerning other trade customs.”).

. See, e.g., United States v. Paul, 175 F.3d 906, 909-10 (11th Cir.1999) (upholding district court's admission of handwriting expert’s testimony based on personal experience and knowledge of general principles in the field over an unreliability objection); Jones, 107 F.3d at 1160-61 (upholding district court’s decision to admit handwriting expert’s testimony based on his "various training experiences, his job responsibilities, his years of practical experience, and the detailed nature of his testimony”).

. See, e.g., City of Tuscaloosa, 158 F.3d at 566 n. 25 (recognizing that testability is not a proper measure of reliability for economic or statistical analyses of allegedly collusive markets "because each such case is widely different from other such cases and because such cases cannot be made the subject of repeated experiments”); Hankey, 203 F.3d at 1169 ("The Daubert factors ... simply are not applicable to [criminal practices] testimony whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it.”).

. The district court's rulings suggest that, if Tressel had only been willing to testify with the careless grace of the government’s witnesses, providing the court with slapdash, but facially numerical, guesstimations, his testimony may have been admitted. R5 at 68-70; see also Maj. Op. at 1264-65 (characterizing Tressel's testimony as unreliable because he could not quantify the word ''expect” or describe a sufficient number of sexual assault investigations to support his conclusions). To favor this brand of off-the-cuff approximations over well-settled, qualitative principles published in numerous editions of the field's leading textbook is hardly, to put it mildly, the hallmark of sound judicial practice. Not only does it create a perverse incentive for experts to fortify overstated conclusions in a manner largely unverifiable by the courts, it circumvents the spirit and letter of Daubert's principles. As one court so tersely put it, "a number pulled out of the air is not 'scientific knowledge.’" Erickson, 131 F.Supp.2d at 1000. Rather than resort to farcical solutions to difficult problems, courts should recognize that the contest between valid qualitative and quantitative data is properly one for the jury. See Daubert, 509 U.S. at 596, 113 S.Ct. at 2798 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.”).

. See, e.g., Boncher v. Brown County, 272 F.3d 484, 486-87 (7th Cir.2001) (upholding district court's rejection of expert testimony that the number of jail suicides in the instant case was "unusually high,” where studies on jail suicide rates were presumably available).

. The Government stated: “We proffer that we’re going to be asking them about their experience and qualifications in these matters, and asking them what the import of this testimony they gave in this case was. To wit, was is the import of the fact that there was nothing found? ” R9 at 363 (emphasis mine).