# United States Court of Appeals
## For the Eighth Circuit

———————————————

No. 13-2759

———————————————

United States ex rel. James Kraxberger

*Plaintiff - Appellant*

v.

Kansas City Power and Light Company

*Defendant - Appellee*

———————

Appeal from United States District Court
for the Western District of Missouri - Kansas City

———————

Submitted: April 17, 2014
Filed: June 27, 2014

———————

Before RILEY, Chief Judge, BENTON and KELLY, Circuit Judges.

———————

BENTON, Circuit Judge.

James M. Kraxberger brought a False Claims Act (FCA) *qui tam* action against Kansas City Power and Light Company. KCP&L, Kraxberger claims, fraudulently induced the General Services Administration to install an all-electric heating-and-

cooling system at the Richard Bolling Federal Building. The district court[1] initially dismissed some of Kraxberger's claims based on the FCA's public disclosure bar. It granted KCP&L summary judgment on another claim. Kraxberger appeals. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

I.

The Bolling Building was historically heated with steam, and cooled with chilled water, provided by Trigen-Kansas City Energy Corporation. In 2005, GSA considered installing an all-electric heating-and-cooling system from KCP&L. KCP&L promised GSA a discounted all-electric rate. KCP&L's electricity rates are regulated by the Missouri Public Service Commission (PSC). As part of its proposal to GSA, KCP&L performed a building life cycle cost (BLCC) analysis. This analysis—delivered in February 2006—assumed a 7% increase in future rates, although PSC testimony from January 2006 showed that KCP&L had proposed an 11.5% increase. Wooing GSA, KCP&L gave Royals and Chiefs tickets to three GSA employees, provided benefits for some employees at a golf tournament, gave a $50 Target gift card to an employee as a wedding present, and paid some expenses on an employee's business trip.

Trigen responded. In an October 4, 2006 letter, it warned GSA that any discount KCP&L offered was subject to regulation. On October 26, Trigen's counsel submitted a Freedom of Information Act (FOIA) request to GSA for all documents about bids or proposals to provide services at the Bolling Building. GSA's response included Trigen's letter and a document showing estimated savings from switching to the KCP&L system.

---

[1]The Honorable Fernando J. Gaitan, Jr., United States District Judge for the Western District of Missouri.

Despite Trigen's warning, a committee of 15 GSA employees chose to install electric boilers and chillers in the Bolling Building. In 2007—at Trigen's urging—the PSC limited KCP&L's all-electric rate only to customers currently receiving the rate. The Bolling Building was excluded from the all-electric rate (the boilers were not completely installed). KCP&L protested. At a PSC hearing in 2008, a KCP&L manager testified that "GSA made financial decisions" based on the all-electric rate, and that the "life-cycle-cost-analysis performed as part of GSA's financial decision making process used the all-electric/space-heating rate." Both the 2006 and 2008 PSC testimony are available on the PSC website. The Bolling Building never received the all-electric rate.

Though not a GSA employee himself, Kraxberger worked on the boilers at the Bolling Building. He discussed KCP&L with GSA employees and contractors. His father, a former GSA employee, gave him a copy of the Trigen letter. In 2011, Kraxberger sued KCP&L as a *qui tam* relator under 31 U.S.C. §§ 3729-30, claiming that KCP&L (1) used false projections in the BLCC analysis, (2) fraudulently promised GSA the all-electric rate, and (3) falsely filed a certification stating that no gratuities had been given. The district court dismissed the BLCC and false-rate claims as publicly disclosed by the FOIA request and PSC testimony. It granted KCP&L summary judgment on the gratuities claim, finding inapplicable the regulations Kraxberger cites. This court reviews both the dismissal and the grant of summary judgment de novo. *See **United States ex rel. Raynor v. National Rural Utils. Coop. Fin., Corp.**, 690 F.3d 951, 954 (8th Cir. 2012); **Wenzel v. Missouri-American Water Co.**, 404 F.3d 1038, 1039 (8th Cir. 2005).

II.

The False Claims Act directs a court to "dismiss an action or claim under this section . . . if substantially the same allegations or transactions as alleged in the action

or claim were publicly disclosed." **31 U.S.C. § 3730(e)(4)(A)**.[2]  Public disclosure may be through a "Federal report, hearing, audit, or investigation." *Id.*  A "written agency response to a FOIA request falls within the ordinary meaning of 'report.'" *Schindler Elevator Corp. v. United States ex rel. Kirk*, 131 S. Ct. 1885, 1893 (2011). Kraxberger argues that *Schindler* should be limited to FOIA requests made by the relator himself or "disclosed in the media or otherwise."  In *Schindler*, the Supreme Court disagreed:  "We also are not concerned that potential defendants will now insulate themselves from liability by making a FOIA request for incriminating documents.  This argument assumes that the public disclosure of information in a written FOIA response forever taints that information for purposes of the public disclosure bar. . . .  [I]t may be that a relator . . . qualifies for the 'original source' exception." *Id.* at 1895 (footnote omitted).  The Trigen letter and other documents disclosed by GSA in response to counsel's FOIA request qualify as public disclosure under *Schindler*.

Public disclosure may also be through the "the news media." **31 U.S.C. § 3730(e)(4)(A)**.  "News media" is not defined in the FCA, though the Supreme Court has acknowledged the term has a "broad sweep." *See, e.g.*, **Schindler**, 131 S. Ct. at 1891 ("The other sources of public disclosure in § 3730(e)(4)(A), especially 'news media,' suggest that the public disclosure bar provides 'a broa[d] sweep.'"), *quoting* **Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel. Wilson**, 559 U.S. 280, 290 (2010) ("The 'news media' referenced in [the public disclosure bar] plainly have a broa[d] sweep.").  Here, the PSC functions as a news organization for public utilities and consumers in Missouri.  The PSC maintains a "media center" hosting press releases, webcasts of public meetings, and the "PSConnection Magazine" (reporting news and promotions related to public utilities). *See* **Section 386.180 RSMo** ("The publications commission shall also from time to time select and

---

[2]At Kraxberger's urging, this court assumes, without deciding, that the current version of the FCA applies.

designate such other works, papers or studies of the public service commission relating to the field of public utilities regulation that may in the judgment of the publications commission be of interest to the public and cause same to be published in pamphlet, book, or electronic form."). *Cf.* **5 U.S.C. § 552** (defining "a representative of the news media" as "any person or entity that gathers information of potential interest to a segment of the public, uses its editorial skills to turn the raw materials into a distinct work, and distributes that work to an audience"). The 2006 and 2008 hearing testimony, publicly available on the website of the PSC, qualify as disclosure through the news media. *See generally* **United States ex rel. Doe v. Staples, Inc.**, 932 F. Supp. 2d 34, 40 (D.D.C. 2013) ("Courts . . . have construed the term 'news media' to include readily accessible websites."); **United States, ex rel. Osheroff v. HealthSpring, Inc.**, 938 F. Supp. 2d 724, 732-33 (M.D. Tenn. 2013) (noting that "many court[s] have held that information on readily accessible public websites constitutes public disclosure").

The PSC testimony and the documents in GSA's response to counsel's FOIA request disclose "substantially the same" allegations as Kraxberger's BLCC and false-rate claims. *See* **31 U.S.C. § 3730(e)(4)(A)**. The PSC testimony shows the 11.5% proposed rate increase, GSA's reliance on the discounted all-electric rate, and its use of the BLCC analysis. The documents in GSA's response to counsel's FOIA request show the 7% rate increase used in the BLCC analysis and warn that KCP&L's rates are subject to regulation. Since Kraxberger's allegations were publicly disclosed, Kraxberger's claim succeeds only if he is an "original source" who has "knowledge that is independent of and materially adds to the publicly disclosed allegations." **31 U.S.C. § 3730(e)(4)(B)**. *See* **Minnesota Ass'n of Nurse Anesthetists v. Allina Health Sys. Corp.**, 276 F.3d 1032, 1045 (8th Cir. 2002) (following the majority view that "a qui tam suit is 'based upon' a public disclosure whenever the allegations in the suit and in the disclosure are the same, 'regardless of where the relator obtained his information'"), *quoting* **United States ex rel. Doe v. John Doe Corp.**, 960 F.2d 318, 324 (2d Cir. 1992).

In his BLCC claim, Kraxberger alleges that KCP&L's analysis did not include the correct rate increase, and that GSA relied on the BLCC analysis. Both the proposed rate increase and GSA's reliance on the BLCC analysis were discussed in the PSC testimony. The rate actually used in the BLCC analysis was included in GSA's response to counsel's FOIA request. In his false-rate claim, Kraxberger identifies "core material misrepresentation regarding electric rates." He says, "Trigen protested, in October of 2006, that KCP&L could not give the GSA . . . the rate KCP&L was promising and explained they were regulated by the [PSC]." He notes that "Trigen's prophecy about the electric rates turned out to be correct." Kraxberger's information about the false-rate claim is essentially the Trigen letter. Even assuming his knowledge is independent of the PSC testimony and GSA's response to the FOIA request, he does not materially add to what was publicly disclosed. *See* **31 U.S.C. § 3730(e)(4)(B)**; *United States ex rel. Rabushka v. Crane Co.*, 40 F.3d 1509, 1514 (8th Cir. 1994) (applying the public disclosure bar "when the essential elements comprising that fraudulent transaction have been publicly disclosed so as to raise a reasonable inference of fraud").

The district court did not err in dismissing the BLCC analysis and false-rate claims.

III.

For the gratuities given to GSA employees, Kraxberger invokes two Federal Acquisition Regulations (FARs):

**FAR § 52.203-3, 48 C.F.R. § 52.203-3, Gratuities**

The right of the Contractor to proceed may be terminated by written notice if . . . the Contractor, its agent, or another representative . . .

[o]ffered or gave a gratuity (e.g., an entertainment or gift) to an officer, official, or employee of the Government.

**FAR § 52.203-11 (2003), 48 C.F.R. § 52.203-11 (2003), Certification and Disclosure Regarding Payments to Influence Certain Federal Transactions**

The offeror, by signing its offer, hereby certifies to the best of his or her knowledge and belief that . . .

(1) No Federal appropriated funds have been paid or will be paid to any person for influencing or attempting to influence an officer or employee of any agency . . . in connection with the awarding of any Federal contract . . . .

(2) If any funds other than Federal appropriated funds . . . have been paid, or will be paid, to any person for influencing or attempting to influence an officer or employee of any agency . . . in connection with this solicitation, the offeror shall complete and submit . . . OMB standard form LLL, Disclosure of Lobbying Activities.

Kraxberger appears to advance several liability theories: (1) the gifts are gratuities, and GSA should have rescinded the contract under § 52.203-3, (2) the gifts are lobbying, and KCP&L should have disclosed its employees as lobbyists under § 52.203-11, (3) the gifts are *payments* for lobbying, and GSA's own employees are lobbyists who KCP&L should have disclosed under § 52.203-11, and (4) the gifts are bribes, and this is a "fraud-in-the-inducement" case.

First, Kraxberger raises FAR § 52.203-3 as a basis for liability. The regulation gives GSA discretion to cancel a contract if a gratuity is given. Kraxberger believes that GSA should have cancelled the contract, and that GSA's decision to proceed makes KCP&L liable under the FCA. Yet, he identifies no evidence that GSA's own regulatory procedures insufficiently dealt with the gratuities. GSA knew about

many—if not all—of the gratuities. It chose to proceed with the contract because it believed the KCP&L system would save it money. *See United States ex rel. Vigil v. Nelnet, Inc.*, 639 F.3d 791, 799 (8th Cir. 2011) (finding that "it would 'be curious to read the FCA, a statute intended to protect the government's fiscal interests, to undermine the government's own regulatory procedures'"), *quoting United States ex rel. Conner v. Salina Reg'l Health Ctr., Inc.*, 543 F.3d 1211, 1222 (10th Cir. 2008); *Francis E. Heydt Co. v. United States*, 948 F.2d 672, 673-74 (10th Cir. 1991) (discussing agency decision to cancel a contract under FAR § 52.203-3).

Second, Kraxberger claims that the gifts are lobbying, and KCP&L's employees are lobbyists who should have been disclosed under the § 52.203-11 certification. A false certification may support liability under the FCA. *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 786 (4th Cir. 1999). Yet, Kraxberger himself cites to § 52.203-3 as the remedy for gratuities, covering both sports tickets as "entertainment" and other gratuities as "gifts." Even ignoring § 52.203-3, Kraxberger does not show that § 52.203-11 is relevant here. Section 52.203-11(1) does not apply since Kraxberger does not show that KCP&L used Federal appropriated funds to purchase the gratuities or pay the employees negotiating with GSA. *See* **48 C.F.R. 52.203-12** ("To the extent the Contractor can demonstrate that the Contractor has sufficient monies, other than Federal appropriated funds, the Government will assume that these other monies were spent for any influencing activities that would be unallowable if paid for with Federal appropriated funds."). Section 52.203-11(2) does not apply since Form-LLL is for disclosing registered lobbyists, not employees negotiating a contract. *See* **Form SF-LLL, Disclosure of Lobbying Activities** (disclosing "the full name . . . of the lobbying registrant under the Lobbying Disclosure Act of 1995 engaged by the reporting entity"); **31 U.S.C. § 1352(d)(2)(A)** (exempting "payments of reasonable compensation made to regularly employed officers or employees" from lobbying disclosure).

Third, Kraxberger argues that the gifts are payments for lobbying, making GSA's own employees KCP&L lobbyists who should have been disclosed under § 52.203-11. This stretches the FAR too far, making any § 52.203-3 gratuity a payment, and any recipient a lobbyist. It requires believing that GSA's own employees should be considered registered lobbyists to whom Form-LLL applies, and that KCP&L knew it was paying lobbyists and fraudulently failed to amend the § 52.203-11 certification.

Fourth, Kraxberger believes that the gifts are outright bribes and this should be analyzed as "fraud-in-the-inducement." This requires Kraxberger to identify evidence showing that the gratuities were "material . . . to [GSA's] decision" and "caused the government to pay out money." *Harrison*, 176 F.3d at 788-89 (analyzing fraud-in-the-inducement under the FCA). Yet, Kraxberger's evidence shows that GSA decided to contract with KCP&L because it would save money. Indeed, Kraxberger attempts to prove this in his BLCC and false-rate claims, arguing that the BLCC analysis and rate promise were crucial to GSA's decision. Even assuming that gratuities given to several members of a 15-person committee were influential, Kraxberger identifies no evidence that GSA's own regulatory controls were insufficient to deal with that influence and that GSA abused its discretion by proceeding with the contract under § 52.203-3.

The district court did not err in granting KCP&L summary judgment on the gratuities claim.

## IV.

Kraxberger alleges several procedural errors. He claims that the district court erred by allowing KCP&L to assert the public disclosure bar after its initial answer, to violate the scheduling order, to submit documents with its motion to dismiss, and to hide the intended use of these documents. This court reviews de novo the district

court's interpretation of the Federal Rules of Civil Procedure. *Kuelbs v. Hill*, 615 F.3d 1037, 1041 (8th Cir. 2010). District court discovery decisions are reviewed for abuse of discretion. *Sentis Group, Inc. v. Shell Oil Co.*, 559 F.3d 888, 899 (8th Cir. 2009). "A district court has very wide discretion in handling pretrial discovery and [this court is] most unlikely to fault its judgment unless, in the totality of the circumstances, its rulings are seen to be a gross abuse of discretion resulting in fundamental unfairness in the trial of the case." *Voegeli v. Lewis*, 568 F.2d 89, 96 (8th Cir. 1977).

Kraxberger argues that KCP&L raised public disclosure as an "unfair surprise." Kraxberger claims it is an affirmative defense that should have been in KCP&L's answer. *See* **Fed. R. Civ. P. 8(c)** ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense."). Kraxberger's only authority that a statutory direction to dismiss is an affirmative defense is *United States ex rel. Jamison v. McKesson Corp.*, 649 F.3d 322 (5th Cir. 2011). There, the court considered a prior version of the FCA, where public disclosure was a jurisdictional bar. It noted that the FCA did not place a burden on relators to "prove a negative: that there are *no* public disclosures of allegations or transactions upon which his action is based." *Jamison*, 649 F.3d at 327. Here, Kraxberger was never required to prove a negative. KCP&L raised public disclosure in a motion to dismiss.

Even if public disclosure were an affirmative defense, "technical failure to comply with Rule 8(c) is not fatal" when the defense "is raised in the trial court in a manner that does not result in unfair surprise." *First Union Nat'l. Bank v. Pictet Overseas Trust Corp., Ltd.*, 477 F.3d 616, 622 (8th Cir. 2007), *quoting* *Financial Timing Publ'ns, Inc. v. Compugraphic Corp.*, 893 F.2d 936, 944 n.9 (8th Cir. 1990). Here, KCP&L raised public disclosure over a month before trial was to begin. *See First Union*, 477 F.3d at 623 (one month's notice "sufficient to preclude unfair surprise"), *citing* **Grant v. Preferred Research, Inc.**, 885 F.2d 795, 797-98 (11th Cir. 1989).

According to Kraxberger, KCP&L's motion to dismiss violated the district court's scheduling order. KCP&L submitted the motion to dismiss on June 20. The scheduling order states, "All other motions, except those which, under Rule 12(h)(2) . . . may be made at any time . . . shall be filed . . . no later than April 11." Rule 12(h)(2) states, "Failure to state a claim upon which relief may be granted . . . may be raised . . . at trial." KCP&L's motion invoking the public disclosure bar, and moving to dismiss for failure to state a claim, was raised well *before* trial. The district court did not err in considering KCP&L's motion to dismiss.

Kraxberger contends that KCP&L abused discovery by submitting documents in its motion to dismiss, ignoring Rule 12(d). But, in a motion to dismiss, a court may consider "matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record." *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 931 n.3 (8th Cir. 2012). Since the FCA *requires* a court to dismiss a claim based on public disclosure, a court necessarily considers the alleged public documents in its dismissal. *See* **31 U.S.C. § 3730(e)(4)**. *Cf. Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003) (in a motion to dismiss, a court may consider documents "alleged in [the] complaint and whose authenticity no party questions"), *quoting In re Syntex Corp. Sec. Litig.*, 95 F.3d 922, 926 (9th Cir. 1996); *Stahl v. United States Dep't of Agric.*, 327 F.3d 697, 700 (8th Cir. 2003) ("In a case involving a contract, the court may examine the contract documents in deciding a motion to dismiss."). The documents KCP&L cites in its motion are integral to the claim, subject to judicial notice, matters of public record, or evidence of public disclosure the court properly considered under 31 U.S.C. § 3730(e)(4).

Kraxberger contends KCP&L violated the "spirit" of Rule 26 by not disclosing documents in a FOIA request by KCP&L. Kraxberger had previously received these documents, but complains that those he received were unredacted and not identified as the response to a FOIA request. Kraxberger does not indicate what he would gain by asking a witness about the FOIA request. The district court did not abuse its

discretion in considering KCP&L's documents.  *See* **Fed. R. Civ. P. 26(e)** (requiring supplemental disclosure when "the additional or corrective information has not otherwise been made known to the other parties during the discovery process").

The district court did not grossly abuse its discretion or make pretrial proceedings fundamentally unfair to Kraxberger.  ***Voegeli***, 568 F.2d at 96.  On the merits, the district court properly dismissed the BLCC and false-rate claims as publicly disclosed.  The district court correctly granted summary judgment on the gratuities claim.

\* \* \* \* \* \* \*

The judgment is affirmed.

_____