[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 22-10963

_____

UNITED STATES OF AMERICA,
Ex Rel.,

Plaintiff,

BRUCE JACOBS,
Relator,

Plaintiff-Appellant,

*versus*

JP MORGAN CHASE BANK, N.A.,

Defendant-Appellee.

———————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 1:20-cv-20543-AMC

———————————

Before WILLIAM PRYOR, Chief Judge, and JILL PRYOR and BRASHER, Circuit Judges.

BRASHER, Circuit Judge:

This appeal requires us to enforce the False Claims Act's public disclosure bar. The FCA's public disclosure bar provides that a "court shall dismiss an [FCA] action or claim . . . if substantially the same allegations . . . as alleged in the action or claim were publicly disclosed . . . from the news media." 31 U.S.C. § 3730(e)(4)(A). This prohibition does not apply if "the action is brought by the Attorney General or the person bringing the action is an original source of the information." *Id.*

The district court dismissed Bruce Jacobs's *qui tam* action against JP Morgan Chase Bank, N.A., under Federal Rule of Civil Procedure 12(b)(6). It did so for two reasons. First, it concluded that his amended complaint did not plead fraud with particularity as required by Federal Rule of Civil Procedure 9(b). Second, it concluded that the gravamen of his fraud claims had already been disclosed on three blogs and that he was not an original source of that information. We need not address Rule 9 because, even if Jacobs pleaded fraud with sufficient particularity, we agree with the

district court that the FCA's public disclosure bar independently forecloses this lawsuit. Therefore, we affirm the district court's dismissal of Jacobs's amended complaint.

## I.

Bruce Jacobs, a Florida foreclosure attorney, brought this *qui tam* action against JP Morgan Chase on behalf of the United States. Jacobs alleges that JP Morgan Chase violated the False Claims Act by forging mortgage loan promissory notes and submitting false reimbursement claims to Fannie Mae and Freddie Mac, government-sponsored enterprises, for loan servicing costs. JP Morgan Chase acquired these promissory notes from Washington Mutual in 2008 after it had collapsed and the FDIC had placed it into receivership. Washington Mutual had previously sold the loans it originated to Fannie Mae and Freddie Mac, and JP Morgan Chase became Washington Mutual's successor-in-interest and the new servicer of these loans.

Jacobs alleges that Washington Mutual forgot to endorse every loan it originated, a violation of federal guidelines, which if discovered would have required it and its successor-in-interest JP Morgan Chase to repurchase the mortgages from Fannie and Freddie or to remit make-whole payments. The lack of proper endorsement, Jacobs asserts, also would have prevented JP Morgan Chase from conveying good and marketable title to Fannie and Freddie in the event of foreclosure and from seeking reimbursement for loan servicing costs. According to Jacobs, JP Morgan Chase concocted a scheme to forge endorsements on millions of loans using

signature stamps bearing the names of previous Washington Mutual employees—like Cynthia Riley—years after Washington Mutual's collapse. Jacobs alleges that JP Morgan Chase, despite its knowing and willful noncompliance with federal guidelines, submitted payment claims to the federal government totaling hundreds of millions of dollars for loan servicing costs it incurred on the Washington Mutual loans. He also alleges that JP Morgan Chase covered up its scheme by coaching witnesses and suborning perjury.

In February 2020, Jacobs sued JP Morgan Chase for violating the False Claims Act. The district court dismissed that complaint without prejudice under Federal Rule of Civil Procedure 12(b)(6), concluding that Jacobs didn't meet the heightened fraud pleading requirements of Federal Rule of Civil Procedure 9(b). The district court also flagged that Jacobs must properly plead that he was an original source of the allegations under the FCA's public disclosure bar but didn't rule on it. The district court gave Jacobs a final opportunity to amend his complaint.

In his amended complaint, Jacobs asserted three violations of the False Claims Act by JP Morgan Chase: (1) express false certification under 31 U.S.C. § 3729(a)(1)(A)–(B); (2) implied false certification under 31 U.S.C. § 3729(a)(1)(A)–(B); and (3) reverse false claim under 31 U.S.C. § 3729(a)(1)(G). His amended complaint describes federal guidelines for government-sponsored enterprises and includes new exhibits of representative loans and payment claims. Jacobs's amended complaint alleges that JP Morgan Chase

foreclosed on mortgages "secured by forged and falsely stamped notes, while concealing the fact that the endorsements were affixed by JPMC years after WaMu ceased to exist using rubber stamps of Cynthia Riley's signature[] and others['] [signatures]."

This time, the district court dismissed the lawsuit with prejudice under Rule 12(b)(6) on two grounds. First, the district court again concluded that Jacobs failed to state a claim because he failed to allege JP Morgan Chase's fraud with sufficient particularity under Rule 9(b). Second, the district court concluded that the FCA's public disclosure provision independently bars Jacobs's lawsuit because online blog articles from before the lawsuit allege that employees would use Cynthia Riley's and other Washington Mutual employees' rubber stamps to fraudulently endorse the loan promissory notes.

The district court took judicial notice of three specific online blog articles. One blog article published on January 21, 2014, was found on "[a] foreclosure information sharing site committed to saving homes from foreclosure." The other two articles appeared in June 2015 and January 2020 on "MFI-Miami," a website about mortgage fraud investigations. All three blog articles mentioned JP Morgan Chase's alleged fraudulent stamping scheme and questioned the validity of the endorsements on the Washington Mutual loans. The blog posts disclosed details related to Cynthia Riley— giving details about how she had left her employment with Washington Mutual before a note was stamped, providing a photograph of one of her stamps, and calling the note endorsement fraudulent.

One of these blogs discussed how in 2012 during other litigation JP Morgan Chase "miraculously found the missing endorsed note" containing Cynthia Riley's stamp even though Riley had left Washington Mutual's employment before the example mortgage closed—an allegation of fraud on the court. And before this lawsuit was filed, another one of these blogs stated that JP Morgan Chase was "stamping the[] Washington Mutual notes with the Cynthia Riley endorsement stamp between 2012 and 2014" as part of its foreclosure efforts.

Based on the blog articles, the district court concluded that substantially the same information as the allegations in the complaint had been publicly disclosed in the news media before Jacobs's lawsuit and concluded that Jacobs wasn't an original source of the information, requiring dismissal under the FCA's public disclosure bar. Jacobs appealed.

## II.

We review *de novo* a district court's decision on a motion to dismiss and any questions of statutory interpretation, including the application of the FCA's public disclosure bar. *See United States ex rel. Osheroff v. Humana, Inc.*, 776 F.3d 805, 809 (11th Cir. 2015).

## III.

The district court decided this appeal on two alternative grounds, but we need address only one. Even if Jacobs's amended complaint pleads fraud with particularity under Federal Rule of

22-10963                 Opinion of the Court                          7

Civil Procedure 9(b), he cannot support an FCA claim because of that act's public disclosure bar.

"One of the FCA's primary purposes is to encourage individuals knowing of government-related fraud to come forward with that information." *United States v. NEC Corp.*, 11 F.3d 136, 139 (11th Cir. 1993), as amended (Jan. 12, 1994) (citation omitted). It follows that a relator cannot bring an FCA claim with substantially the same allegations as "allegations that are already publicly disclosed" in the "news media" unless the relator is an original source of that information. *United States ex rel. Bibby v. Mortg. Invs. Corp.*, 987 F.3d 1340, 1353 (11th Cir. 2021) (citing 31 U.S.C. § 3730); *see also* 31 U.S.C. § 3730(e)(4)(A). Without this public disclosure bar, "opportunistic relators—with nothing new to contribute—could exploit the FCA's *qui tam* provisions for their personal benefit." *Bibby*, 987 F.3d at 1353 (emphasis added) (citing *United States ex rel. Springfield Terminal Ry. Co. v. Quinn*, 14 F.3d 645, 649 (D.C. Cir. 1994)).

To that end, the FCA provides that we "shall dismiss an [FCA] action or claim . . . , unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed . . . from the news media." 31 U.S.C. § 3730(e)(4)(A). This prohibition does not apply if "the action is brought by the Attorney General or the person bringing the action is an original source of the information." *Id.* "For purposes of this paragraph, 'original source' means an individual who" was a whistleblower to the government of the information in the allegations before the public disclosure or "who has knowledge

that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section." *Id.* § 3730(e)(4)(B).

The district court took judicial notice of three online blog articles that recount allegations about JP Morgan Chase's deceptive use of Washington Mutual signature stamps to forge mortgage endorsements. Jacobs correctly does not contest the district court's decision to take judicial notice of these websites at the motion to dismiss stage. *See Osheroff*, 776 F.3d at 811–16 (concluding that the district court could take judicial notice of news articles during the three-part public disclosure bar test at the motion to dismiss stage); *see also id.* at 811 n.4 ("[C]ourts may take judicial notice of documents such as the newspaper articles at issue here for the limited purpose of determining which statements the documents contain (but not for determining the truth of those statements)."). He argues only that they do not warrant dismissing his amended complaint under the public disclosure bar.

We use a three-part test to determine whether the FCA's public disclosure bar applies. *See id.* at 812 (citing *Cooper v. Blue Cross & Blue Shield of Fla., Inc.*, 19 F.3d 562, 565 n.4 (11th Cir. 1994)). We begin by asking whether "the allegations made by the plaintiff [have] been publicly disclosed." *Id.* (quoting *Cooper*, 19 F.3d at 565 n.4). If the answer is "yes," we ask whether "the allegations in the complaint are 'substantially the same' as . . . allegations or transactions contained in public disclosures." *Id.* (quoting 31 U.S.C.

§ 3730(e)(4)). If the answer to that question is also "yes," we ask whether "the plaintiff[is] an 'original source' of that information." *Id.* (quoting *Cooper*, 19 F.3d at 565 n.4).

We address each part of our test in turn.

*A.*

First, we must determine whether the three blogs "publicly disclosed" allegations "from the news media" prior to this lawsuit. 31 U.S.C. § 3730(e)(4)(A); *see also Osheroff*, 776 F.3d at 812. There are two issues here. The first issue is one of timing—whether these blog posts were publicly disclosed before the suit. The second issue is whether these blog posts count as "news media" under the statute.

The timing issue is easily resolved. One blog article was published on January 21, 2014, on "[a] foreclosure information sharing site committed to saving homes from foreclosure." The other two articles were published in June 2015 and January 2020 on "MFI-Miami," a website about mortgage fraud investigations. It is undisputed that all three articles were publicly available online before Jacobs filed his initial complaint in February 2020.

The second issue is more complicated. Jacobs argues that these articles do not qualify as "news media" under the plain and ordinary meaning of that term. But Jacobs's argument is inconsistent with our precedent. We have held that the term "news media" in section 3730(e)(4)(A) "has 'a broad[] sweep.'" *Osheroff*, 776 F.3d at 813 (alteration in original) (quoting *Graham Cnty. Soil &*

*Water Conservation Dist. v. United States ex rel. Wilson*, 559 U.S. 280, 290 (2010)) (citing *Schindler Elevator Corp. v. United States ex rel. Kirk*, 563 U.S. 401, 408 (2011)). And we have specifically concluded that "publicly available websites . . . intended to disseminate information . . . qualify as news media for purposes of the public disclosure provision." *See id.*

Jacobs argues that our statements in *Osheroff* about publicly available websites are dicta. We disagree. In *Osheroff*, the plaintiff's complaint "allege[d] that [] [several health] clinics offered [] services without regard for medical purpose or financial need and that the value of the services is more than nominal"—an alleged violation of federal law. *Id.* at 808. The defendants, including three health clinics, submitted public pages of the clinics' websites with information about the clinics' free programs to establish that the information was publicly available in the "news media" before the suit. *See id.* at 807–08, 813. We held that "publicly available websites . . . intended to disseminate information" are "news media" under the FCA. *Id.* at 813. This statement was not dicta because it was necessary to our decision in *Osheroff* in step one of our test: we had to decide whether the company website in *Osheroff* counted as "news media," and we answered that question in the affirmative.

Finally, Jacobs argues that the company websites in *Osheroff* are distinguishable from the blogs in this case because these blogs are merely individual-run accounts that broadcast the personal views of their authors. Again, we disagree. To be sure, Jacobs is correct that we did not hold in *Osheroff* that *all* websites are "news

media." But Jacobs's argument still fails because we held in *Osheroff* that "news media" under the FCA isn't limited to traditional news reporting methods—the key question is whether a website is "publicly available" and "intended to disseminate information" to the public. *Id.* Under that standard, the blogs at issue here are just as clearly "news media" as the company websites we addressed in *Osheroff*. These blogs—no matter their precise size or sweep—are publicly available websites that bill themselves as disseminating foreclosure-related and mortgage-related information to the public. Because there is nothing private or personal about these blogs, we need not address whether the term "news media" under the FCA covers a private or personal social media page.

In short, we conclude that the blog articles "qualify as news media" under the FCA's public disclosure bar and had been "publicly disclosed" before Jacobs's suit. *Id.* at 813–14.

*B.*

Second, because we conclude that these blogs publicly disclosed their allegations in the news media, we next must ask whether "the allegations in the complaint are 'substantially the same' as . . . allegations or transactions contained in public disclosures." *Id.* at 812 (quoting 31 U.S.C. § 3730(e)(4)). This part of the test is "a quick trigger to get to the more exacting original source inquiry." *Id.* at 814 (quoting *Cooper*, 19 F.3d at 568 n.10). "[S]ignificant overlap between [the plaintiff]'s allegations and the public disclosures is sufficient to show that the disclosed information forms

the basis of th[e] lawsuit and is substantially similar to the allega-tions in the complaint." *Id.*

Jacobs contends that his allegations are not substantially the same as the ones in the blog articles because they are not identical. The argument is that because "substantially" means "the essentials of something" and because "same" means "identical," "substan-tially the same" means "identical." That argument fails as a matter of logic and because it disregards the FCA's plain text and our prec-edent. We have explained that "substantially the same" does not mean *identical*, as Jacobs argues, but "significant overlap." *Id.* In this Circuit, "[t]he language of our laws is the law." *CBS Inc. v. Prime-Time 24 Joint Venture*, 245 F.3d 1217, 1227 (11th Cir. 2001). If "sub-stantially the same" meant "identical," the statute would say "same." We must give effect to the actual words Congress used.

All three blog articles significantly overlap with the allega-tions in Jacobs's complaint. They all mention JP Morgan Chase's alleged fraudulent stamping scheme and question the validity of the endorsements on the Washington Mutual loans. The blogs even disclose details about a specific Washington Mutual employee named in the complaint, Cynthia Riley. The blogs discuss how Cynthia Riley left her employment with Washington Mutual be-fore a note was stamped, include a photograph of one of her stamps, and allege that the note endorsement was fraudulent. One blog article questions whether the notes endorsed by Cynthia Riley that JP Morgan Chase had produced in foreclosure cases were "fake or a possible act of fraud." Another blog article implies that JP

Morgan Chase had something to do with this fraud by discussing how in 2012, during other litigation, JP Morgan Chase "miraculously found [a] missing endorsed note" containing Cynthia Riley's stamp even though Riley had left Washington Mutual's employment before the mortgage closed and would not have had a note to stamp. The third blog article goes further—explicitly alleging that JP Morgan Chase was "stamping the[] Washington Mutual notes with the Cynthia Riley endorsement stamp" as part of its foreclosure efforts.

The content of these blog articles significantly overlaps with Jacobs's allegations. Like the blog articles, Jacobs's amended complaint alleges that JP Morgan Chase foreclosed on mortgages "secured by forged and falsely stamped notes, while concealing the fact that the endorsements were affixed by JPMC years after WaMu ceased to exist using rubber stamps of Cynthia Riley's signature[] and others['] [signatures]."

To be sure, these articles do not specifically allege False Claims Act fraud. They are mostly about committing fraud on the court in foreclosure proceedings. But Jacobs's key allegations of fraudulent activity have significant overlap with the three blog articles. It is important in the Rule 9(b) context for an FCA complaint to contain details about the submission of a false claim to the government. *See Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1013 (11th Cir. 2005). But under the "substantially the same" standard, those details don't matter for purposes of the public disclosure bar. Our case law requires significant overlap, not that a mirror image of the

complaint's allegations had been publicly disclosed. Therefore, the information disclosed in the blog articles is substantially the same as the allegations in Jacobs's lawsuit.

## C.

Third, because the complaint's allegations are substantially the same as the ones in the blog articles, the FCA's public disclosure bar prohibits Jacobs's lawsuit unless he can establish that he is an "original source" of that information. 31 U.S.C. § 3730(e)(4)(A); *see also Osheroff*, 776 F.3d at 812 (quoting *Cooper*, 19 F.3d at 565 n.4). As relevant here, an "original source" is an individual "who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions" and provided that information to the government before filing the suit. 31 U.S.C. § 3730(e)(4)(B).

Jacobs posits that he falls within the original source exception because his law practice gave him independent knowledge of JP Morgan Chase's fraud. Thus, the argument goes, the amended complaint materially adds to the public disclosures from the blog articles. We disagree.

If the public disclosures are "already sufficient to give rise to an inference" of fraud, cumulative allegations do "not materially add to the public disclosures." *Osheroff*, 776 F.3d at 815 (citing *United States ex rel. Kraxberger v. Kan. City Power & Light Co.*, 756 F.3d 1075, 1079 (8th Cir. 2014)). "[B]ackground information [and details] that help[] one understand or contextualize a public disclosure is insufficient to grant original source status" under the FCA. *Id.* The

original source doctrine "increase[s] private citizen involvement in exposing fraud" but "prevent[s] opportunistic suits by private persons who heard of fraud but played no part in exposing it." *Id.* at 815–16 (quoting *Cooper*, 19 F.3d at 565).

No doubt, Jacobs's experience from his law practice has shed light on how JP Morgan Chase defends certain foreclosure actions and allowed him to call into question the endorsements of some specific Washington Mutual loans. But his litigation against JP Morgan Chase has not provided him with independent information to corroborate his stamping scheme theory or his allegation that JP Morgan Chase submitted false claims to the government. Nor does the amended complaint materially add to the core claims in the blog articles—that JP Morgan Chase fraudulently endorsed Washington Mutual promissory notes to strengthen its legal position in foreclosure proceedings.

Jacobs also argues that he alleges a broader fraud than the blog articles because the amended complaint questions the validity of every Washington Mutual loan acquired by JP Morgan Chase and alleges a cover-up scheme. And he observes that the blog articles do not mention Fannie, Freddie, or false reimbursement claims by JP Morgan Chase. In this way, Jacobs argues that he is an original source of the FCA claims because in another lawsuit he deposed a JP Morgan Chase representative who said that JP Morgan Chase sold the loan to Fannie Mae. Again, we disagree.

The additional allegations about the government-services enterprises and JP Morgan Chase's potential FCA violations as well

as the cover-up scheme merely supplement and contextualize the core fraud hypothesis in the blog articles. As discussed above, the blog articles don't give just general information. They discuss details and explicitly allege fraud. The blog articles are "already sufficient to give rise to an inference" of fraud, so the additional information Jacobs claims to have provided does "not materially add to the public disclosures." *Id.* at 815 (citing *Kraxberger*, 756 F.3d at 1079). The publicly revealed information about the so-called stamping scheme gives rise to the inference of FCA fraud because we can infer from the blog articles' details that there was general fraud, which led to false submissions to the government—defeating Jacobs's position that he is an original source of the information. *See id.* (citing *Kraxberger*, 756 F.3d at 1079); *see also id.* at 808, 815 (holding that pre-suit news media allowed an inference that the defendants violated other statutes like the Anti-Kickback Statute and the Civil Monetary Penalties Law, which was sufficient to make Osheroff not an original source for his implied certification theory fraud claim allegations).

⋆ ⋆ ⋆

The blog articles publicly disclosed in the news media substantially the same allegations as those in Jacobs's lawsuit before he filed it, and he is not an original source of the information. Therefore, the FCA's public disclosure provision bars this lawsuit.

## IV.

We **AFFIRM** the district court.